IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| JOHN MITCHELL, DENNIS E. MULQUEEN, and DENNIS S. MULQUEEN,<br><br>    Plaintiffs,<br><br><br><br><br><br>      vs.<br><br><br>FRANK T. SMITH III, and John Does 1-10,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT<br><br><br><br><br>Case No. 1:08-CV-103 TS |

This matter is before the Court on Plaintiffs' unopposed Motion for Partial Summary Judgment as to Defendant's four remaining counterclaims and Plaintiffs' remaining claims. For the reasons discussed below, the Court will grant the Motion in part and deny it in part.

The Court notes that Defendant has failed to respond to Plaintiffs' Motion for Partial Summary Judgment. Defendant attended a status conference before the Magistrate Judge on February 22, 2010. At that time he indicated that he was in the process of retaining new counsel, and the Court instructed him to have new counsel file a notice of appearance by February 26,

2010.  No appearance of counsel has been filed.  On September 16, 2010, Plaintiffs served a copy

of their Motion for Partial Summary Judgment on Defendant via U.S. mail at the address on file

with the Court.  On October 19, 2010, Plaintiffs served a copy of the Request to Submit for

Decision on Defendant.  Defendant has not filed anything with the Court since he appeared at the

February status conference.

## I.  FACTUAL BACKGROUND

Because the Motion is unopposed, the Court accepts as true, for purposes of this Motion,

the facts as described in Plaintiffs' Statement of Undisputed Facts to the extent they are

supported by citation to the record; the Court will view the facts in the light most favorable to the

non-moving party.[1]

The Affidavit of Plaintiff Dennis Mulqueen ("Mulqueen") provides the basic background

information for this case.[2]  In December 2005, Mulqueen contacted Defendant Frank Smith

("Smith") regarding advertised land near Bear Lake, Utah.  In this and subsequent conversations,

Smith conveyed his plans to develop additional land in the area.  In these conversations Smith

represented that he owned the additional land, was looking for capital investors, and that he

would oversee the development (putting in roads, sewer, water, electricity, and getting final plat

approval from Garden City), and market the improved subdivided land.

---

[1] *Sanchez-Figueroa v. Banco Popular de Puerto Rico*, 527 F.3d 209 (1st Cir. 2008) (citing *Aguilar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 25 (1st Cir. 2006)).

[2] Docket No. 43, Ex. D.

Smith further expressed that he foresaw the developments being completed in the summer of 2006 and that he was looking for no more than six investor members. There were to be sixty-five lots on seventy-two acres of land, and the members of the proposed company would eventually divide up the lots among themselves by choosing them on a rotating basis. The members would then keep the profits resulting from selling their selected plots. Smith represented that it would cost between $8,000 and $10,000 to develop each lot, that more than half the lots already had reservations (potential buyers), and the lots were selling for approximately $50,000. Smith also stated that the subdivision had nearly received final plat approval, that the electricity was already in place, that water would be ready by spring 2006, that there were no access issues to the property, and that there were no loans or liens affecting the property.

In January 2006, the Plaintiffs Mulqueen, Mulqueen's Father, and John Mitchell collectively purchased a 37.3% interest in Smith's proposed subdivision, which was named Elk's Ridge Phase II. Plaintiffs paid $425,492.50.

In October 2006, Mulqueen loaned Smith $50,000 under a promissory note.[3] Under the terms of the note, Smith was to repay the principal plus interest by December 16, 2006. Smith eventually paid back the principal in November 2007, but failed to pay the interest or the late penalty as mandated by the promissory note.[4]

---

[3] *Id.* at Ex. E.

[4] *Id.* at 7.

In May 2007, Smith and the investors of Elk Ridge Phase II formed Elk Ridge Phase II

Members, LLC.  The following provisions of the Operating Agreement are at issue in this matter:

6.2.　　Additional Capital Requirements. Should the Members by majority vote (greater than 50% of the distributive shares) determine that additional capital is required to acquire, retain or maintain capital assets of the Company or to pay operating expenses of the Company, the Members shall contribute such additional capital as may be required in proportion to their distributive shares. Should any one or more of the Members neglect or refuse to make the additional capital contributions required, the remaining members, on a pro rata or other agreed basis may lend the deficiency in additional capital to the Company. Should none of the Members contribute or lend the deficiency in capital contributions to the Company, the Manager may borrow the deficiency from whatever sources are available to the Company, including from Members themselves, upon such terms as are acceptable to the Manager.

. . . .

6.6　　Contributions for Development. The Company will develop Elk's Ridge Phase II, which is located in Garden City, Utah (the "Development"). Each Member (excepting Mr. Dale Brower and Bear Lake Holdings, LLC each of whom are subject to other prior contractual obligations) will be responsible for contributing to the Company their proportionate share (herein the "Construction Contribution") of all costs of materials and the costs of the improvements required for the Development by State and local municipalities, plus an additional 10% to cover possible overages. The Construction Contribution for each of the Members will include all costs and expenses for the above referenced improvements, which by way of description and not by way of limitation, may include all costs for roads, sewer lines, water lines, electricity, other utilities, fees, surveys and engineering.

6.7　　Payment of Construction Contribution. Each Member (excepting Mr. Dale Brower and Bear Lake Holdings, LLC) will contribute its Construction Contribution in two possible ways:

A.　　A Member may elect to pay all or a portion of its Construction Contribution by depositing funds into an escrow account with Cache Valley Bank. If a Member elects to pay all of its Construction Contribution by depositing the funds in the escrow account, that Member will be released from liability for any interest and other costs of borrowing that

may accrue or be incurred in conjunction with loans taken out by the Company to satisfy any costs and expenses related to the Development.

B.      A Member may also elect to pay all or a portion of its Construction Contribution by having funds withheld from the sale of the lots after the Development is complete and the lots are distributed under the provisions of this Agreement. If a Member elects to pay its Construction Contribution in this manner, then said Member agrees to execute any necessary promissory notes to evidence the Member's remaining Construction Contribution obligation and provide the Company with a first position deed of trust on the lots distributed to the Member. Accordingly, as each lot is sold, the proceeds (net of sales commissions and costs of closing) will be paid first to the Company until the Member's Construction Contribution obligation has been satisfied.

C.      If at the conclusion of the Development and the payment of all related costs and expenses a Member has contributed into the escrow account more funds than are necessary to cover that Member's pro rata share of the Construction Contribution, the excess funds will refunded to the contributing Member.

. . . .

7.5 A. <u>Distribution of Lots.</u> After recording of the final plat covering the Development, the individual lots of the Development will be distributed (subject to each Member's obligation for payment of his/her pro rata share of Construction Contribution AND subject to a lien in favor or Cache Valley Bank, securing its obligations under a letter of credit) to the Members according to the following schedule: . . . .

. . . .

16.8      <u>Further Instruments.</u> The Members agree that they will execute any and all other documents or legal instruments that may be necessary or required to carry out and effectuate all of the provisions hereof.[5]

---

[5]*Id.* at Ex. A.

In August 2007, Smith approached Mulqueen and offered to sell him 40 acres of land that were not part of the Elk Ridge development. Smith represented that the land had ready access to utilities, which was not true. Mulqueen purchased the land for $1,000,000.

The Elk Ridge development was never completed because it lacked funds. At one point Smith attempted to get all of the members to sign letters of credit with Cache Valley Bank so that Cache Valley Bank would then issue letters of credit to Garden City guaranteeing that the development would be completed. The letters of credit were never issued and the development failed—the construction company stopped work and Garden City never permitted the final plat to be recorded.

Smith claims that the development failed because the members refused to sign the letters of credit. Mulqueen disagrees. He has produced evidence that in 2004 Smith secured a personal debt of $800,000 with land contained in the Elk Ridge Phase II development.[6] Cache Valley Bank would not have issued the letter of credit, even if the members had signed letters to the bank, unless its deed was in first position—thus, the 2004 debt had to either be satisfied or subordinated to the proposed Cache Valley Bank letter of credit.[7] Smith never requested that the initial debt be subordinated, nor did he satisfy the debt. The creditor foreclosed on the property in 2009.[8]

---

[6] *Id.* at Ex. G.

[7] *Id.* at Ex. F.

[8] *Id.* at Ex. G.

## II. LEGAL STANDARDS

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[9]   In considering whether a genuine issue of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[10]   The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[11]   Both movants and nonmovants of summary judgment motions must support their assertions by  "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[12]

"The standard is somewhat modified in an unopposed motion for summary judgment."[13] "[I]t is improper to grant a motion for a summary judgment simply because it is unopposed."[14] "It is the role of the court to ascertain whether the moving party has sufficient basis for judgment

---

[9]FED. R. CIV. P. 56(a).

[10]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[11]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[12]FED. R. CIV. P. 56(c)(1).

[13]*Thomas v. Bruce*, 428 F. Supp. 2d 1161, 1163 (D. Kan. 2006).

[14]*E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F. Supp. 406, 407 (D. Kan. 1986) (citing *Hibernia Nat'l Bank v. Administracion Central Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985)).

as a matter of law.  In so doing, the court must be certain that no undisclosed factual dispute would undermine the uncontroverted facts."[15]  The Court "must consider the plaintiff's . . . claim based on the record properly before the court, viewing the uncontested facts in the light most favorable to the non-moving party."[16]

## III.  SMITH'S COUNTERCLAIMS

Smith claims that Plaintiffs breached the LLC operating agreement, violated the implied covenant of good faith and fair dealing, defamed him, and intentionally interfered with his business relations.  As discussed below, the Court grants summary judgment on all of Smith's counterclaims.

### A.  BREACH

According to Plaintiffs' Memorandum, Smith argues, in responses to written discovery requests, that Plaintiffs breached four paragraphs of the LLC operating agreement.

#### 1.  *Paragraph 6.2*

Paragraph 6.2 requires LLC members to contribute additional capital if a call for additional capital is made and a majority vote of the members ("greater than 50% of the distributive shares"[17]) determines that the capital is necessary.  No such call was ever made.  Thus summary judgment in favor of Plaintiffs is proper.

---

[15]*Thomas*, 428 F. Supp. 2d at 1163 (citing *Lady Baltimore Foods*, 643 F. Supp. at 407).

[16]*Sanchez-Figueroa*, 527 F.3d 209 (citing *Aguilar-Carrasquillo*, 445 F.3d at 25).

[17]Docket No. 43, Ex A at 4.

2.      *Paragraphs 6.6 & 6.7*

Paragraph 6.6 requires LLC members to contribute their proportionate share of development costs.  Paragraph 6.7 specifies that members may make their contributions in two ways, by either providing the funds up front or having funds later withheld from the sale of the member's developed lots.  If members select the second option they must execute necessary promissory notes and ensure that the notes have first priority on the member's lots.

Plaintiffs argue that the letters of credit Smith sought to have them sign were not promissory notes and that the operating agreement only requires them to sign promissory notes. BLACK'S LAW DICTIONARY defines a letter of credit as

> [a]n instrument under which the issuer (usu. a bank), at a customer's request, agrees to honor a draft or other demand for payment made by a third party (the *beneficiary*), as long as the draft or demand complies with specified conditions, and regardless of whether any underlying agreement between the customer and the beneficiary is satisfied.[18]

A promissory note is defined as "[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer. A note is a two-party negotiable instrument, unlike a draft (which is a three-party instrument)."[19]

From these definitions it is clear that a letter of credit—an instrument that allows a bank to act as the "middle-man" between two other parties—is not a promissory note, which involves a direct transaction between two parties.  Because Smith only requested that Plaintiffs sign letters

---

[18]BLACK'S LAW DICTIONARY 914-15 (7th ed. 1999) (emphasis in original).

[19]*Id.* at 1085.

of credit and not promissory notes, they did not violate paragraphs 6.6 & 6.7 of the operating agreement.

### 3. *Paragraph 7.5(A)*

Paragraph 7.5(A) merely provides a list of how the lots will be divided among the members *after the final plat is recorded*. No final plat was ever recorded. Thus, Plaintiffs could not have breached this paragraph.

### 4. *Paragraph 16.8*

Paragraph 16.8 requires LLC members to "execute any and all other documents or legal instruments that may be necessary" for the LLC to meet its purpose. Plaintiffs argue that they did not breach this paragraph because none of the members signed the letters of credit and signing them would have been futile because Cache Valley Bank would not have issued a letter of credit unless it was first in priority to foreclose on the land. Because Smith used some of the land to secure a personal debt, the Cache Valley Bank letter of credit would not have been first in priority. Furthermore, Plaintiffs argue that this paragraph should not be interpreted to require them to sign every document Smith placed before them. In light of the lack of any response refuting these arguments, the Court finds them persuasive and finds that Plaintiffs did not breach paragraph 16.8.

## B. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

In his response to interrogatories, Smith claimed that Plaintiffs "'violated the implied covenant of good faith and fair dealing by calling Defendant 3 times a day, inundating him with

e-mails, threatening him, and generally using up his time to the detriment of the project and Defendant's rights.'"[20]

As stated by the Utah courts, "[u]nder the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."[21]

No evidence before the Court supports Smith's implied covenant of good faith and fair dealing claim. There is no evidence to show that Mulqueen's constant attempts to contact Smith were made with the intention of denying Smith the fruits of the Operating Agreement. Furthermore, it would be illogical to conclude this was the case because the fruits of the contract were the proceeds the members hoped to derive from the sale of the developed lots. If Mulqueen was attempting to deny Smith the benefits of the contract, then he would have also been attempting to deny himself the benefits from finishing the project. The evidence shows that Mulqueen was very concerned about receiving the benefits from the contract. Therefore, the Court grants summary judgment in favor of Plaintiffs on this counterclaim.

C.    DEFAMATION

Defendant's counterclaim of defamation alleges that "Plaintiffs have published statements regarding Defendant in Rich County that Defendant is dishonest and incompetent in

---

[20]Docket No. 40, at 14.

[21]*St. Benedict's Dev. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991).

his business dealings," and "[t]hese statements are false, and known by Plaintiffs to be false, or were made without knowing whether they were true or not, in order to harm Plaintiff."[22]

This is a diversity action, and consequently the Court applies the defamation law of the forum state of Utah.[23]  In order to state a valid counterclaim for defamation, Smith must show: "(1) the [plaintiff] published statements concerning the [defendant]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statement resulted in damages."[24]  If Smith cannot meet the damages requirement, he may still state a valid claim if he can satisfy the requirements of defamation per se, namely the alleged defamatory statement must either: charge criminal conduct; impute a loathsome disease; reflect on the fitness of the person to engage in his business, trade or profession or hold some office; or charge unchastity of a woman.[25]

Under Utah law, when one private individual brings a defamation action against another private individual, the Court must classify the defamation into one of three categories and apply the appropriate degree of fault standard.[26]  The first classification is purely private defamation. Defamation in a "purely private matter" occurs where all of the parties are private figures, no

---

[22]Docket No. 15, at 5.

[23]*Safeco Ins. Co. of Am. v. Hilderbrand*, 602 F.3d 1159, 1163 (10th Cir. 2010) (citing *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)).

[24]*Deary v. Godbe*, 992 P.2d 979, 983 (Utah 1999).

[25]*U.S.A. United Alliance, LLC v. Workers' Comp. Fund*, 213 P.3d 20, 26 (Utah Ct. App. 2009).

[26]*Ferguson v. Williams & Hunt, Inc.*, 221 P.3d 205, 213-14 (Utah 2009).

issue of public concern is involved, and no privilege applies.[27] Utah courts have not determined whether the degree of fault standard of strict liability or negligence applies in purely private defamation.[28] The second classification involves matters of public interest. This type of defamation occurs when a case involves "a private plaintiff *and* a public concern."[29] Utah law does not provide a clear definition of what constitutes a matter of public concern, and examples found in Utah case law are limited.[30] The public interest classification applies negligence as the degree of fault standard.[31] The final classification category is privileged defamation. Under Utah law,

> [a] conditional privilege arises to protect a legitimate interest of the publisher, the recipient, or a third person. The privilege also extends to statements made to advance a legitimate common interest between the publisher and the recipient of the publication. . . . The conditional privilege also permits mistakes to be made; otherwise, there would be no need for the privilege.[32]

In determining whether a conditional privilege applies, a court should "balanc[e] the justification for the privilege against the individual's interests in reputation."[33] It is clear that the privilege is

---

[27]*Id.* at 214.

[28]*Id.*

[29]*Id.* at 213 (emphasis in original).

[30]*See, e.g.*, *Ogden Bus Lines v. KSL, Inc.*, 551 P.2d 222, 226 (Utah 1976) (holding that "the safety of the transportation of school children" is a matter of public concern).

[31]*Ferguson*, 221 P.3d at 213

[32]*Id.* at 214 (quotation marks and citations omitted).

[33]*Id.*

lost if the defendant knew the statement to be false at the time of publication, the defendant acted with actual malice,[34] or if other common law means of losing the privilege apply such as "excessive publication or common law malice."[35]

Here, Plaintiffs claim the alleged defamation is privileged. This is because the statements regard Smith's ability to fulfill his managerial role in the LLC and his honesty in doing so, and were made to other LLC members and local law enforcement. The Court finds the alleged defamatory statements were made "to advance a legitimate interest between" Plaintiffs, the LLC members, and law enforcement officials. Plaintiffs have a legitimate interest in discussing with other LLC members the LLC manager's fitness to manage. Local law enforcement officers have a legitimate interest in having potential criminal activity reported to them. Thus, the statements to both the LLC members and law enforcement are privileged. Smith, in not responding to the Motion, has failed to produce any evidence why the privilege should be lost. Therefore, the Court grants Plaintiffs' Motion in regards to the defamation claim.

D.     INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

Smith alleges that Plaintiffs' alleged defamatory statements constitute intentional interference with contractual relations. "To establish a claim for intentional interference with a contractual relationship, 'a plaintiff must demonstrate that (1) . . . the defendant intentionally

---

[34]"Actual malice," as used in defamation actions, is defined as acting in reckless disregard as to the statement's falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), and BLACK'S LAW DICTIONARY 968 (7th ed. 1999).

[35]*Ferguson*, 221 P.3d 212-215. Common law malice is defined as "an improper motive of spite or ill will." BLACK'S LAW DICTIONARY 212 (7th ed. 1999).

interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff.'"[36] The second prong can be proven by one of two means. Regarding the first alternative, improper purpose, "it is not enough to show that the defendant was motivated by ill will toward the plaintiff. Rather, the plaintiff must show that the defendant's 'predominant purpose was to injure the plaintiff.'"[37] The second alternative, improper means, can be satisfied by showing "'that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession.'"[38]

Smith has not offered evidence to show improper purpose. Smith contends that the alleged defamation constitutes an improper means. However, as discussed above, the defamation claim has been decided against Smith. Thus, he has not presented sufficient evidence to satisfy the improper means standard and his intentional interference counterclaim fails. Summary judgment in favor of Plaintiffs' is proper on this counterclaim.

---

[36]*Jones & Trevor Marketing, Inc. v. Lowry*, 233 P.3d 538, 545 n.16 (Utah 2010) (quoting *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 331 (Utah 2005) (omission in original)).

[37]*Anderson Dev. Co.*, 116 P.3d at 331 (citing and quoting *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1984)).

[38]*Id.* (quoting *Pratt v. Prodata, Inc.*, 885 P.2d 786, 787 (Utah 1994)).

## IV. PLAINTIFFS' CLAIMS

Plaintiffs seek summary judgment against Smith on all of their remaining claims, specifically breach of fiduciary duty, negligence, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, and breach of contract.

### A.    BREACH OF FIDUCIARY DUTY

Plaintiffs claim that Smith breached the fiduciary duty he owed as sole manager of the LLC by not disclosing the existence a trust deed against some of the LLC property which secured a personal debt and by not making timely payments on that debt causing the creditor to foreclose on the property.

An LLC manager "'shall discharge his duties . . . with the care an ordinarily prudent person in a *like position* would exercise *under similar circumstances.*'"[39]  The manager is not liable unless the breach constitutes gross negligence, willful misconduct, or "a breach of a higher standard of conduct . . . [as] established in the company's articles or organization or operating agreement."[40]  "[W]hen [a] fiduciary relationship exists at time of transaction, [the] agent has [a] burden to show full disclosure of all relevant information to [the] principal before entering into transaction."[41]  Thus, in order for summary judgment to be proper, the evidence before the Court

---

[39]*Stevensen 3rd East, LC v. Watts*, 210 P.3d 977, 986 (Utah Ct. App. 2009) (emphasis in original) (quoting UTAH CODE ANN. § 16-10a-840(1)(b) (2005)).

[40]UTAH CODE ANN. § 48-2c-807(1).

[41]RESTATEMENT (THIRD) OF AGENCY § 8.06, Reporter's Notes (d) (citing *Kirkruff v. Wisegarver*, 697 N.E.2d 406, 411-12 (Ill. Ct. App. 1998)).

must demonstrate that Smith violated the fiduciary duties of an LLC manager in a property investment LLC and that his conduct was grossly negligent or willful.

The Court finds that Smith violated his fiduciary duties in two ways. First, he failed to disclose that some of the lots owned by the LLC were subject to liens securing a personal debt. Second, he failed to pay off the debt, thus endangering LLC property. Both of these actions constitute either gross negligence or willful misconduct.

Under Utah law, Plaintiffs may recover equitable damages as well as tort damages.[42] However, the Court will address the actual amount of damages after holding an evidentiary hearing on damages in this case.

B.      NEGLIGENCE

"The essential elements of a negligence action are: (1) a duty of reasonable care owed by the defendant to plaintiff; (2) a breach of that duty; (3) the causation, both actually and proximately, of injury; and (4) the suffering of damages by the plaintiff."[43]  "The issue of whether a duty exists is entirely a question of law to be determined by the court."[44]

The above finding regarding breach of fiduciary duty shows a duty and breach of that duty. It is clear that Smith's actions caused some damages to Plaintiffs in that the value of the

---

[42]*Stevensen 3rd East, LC*, 210 P.3d at 986-87.

[43]*Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985) (citations omitted).

[44]*Ferree v. State*, 784 P.2d 149, 151 (Utah 1989) (citing *Weber ex rel. Weber v. Springville City*, 725 P.2d 1360, 1363 (Utah 1986); PROSSER & KEETON ON THE LAW OF TORTS § 37, at 236 (W. Keeton 5th ed. 1984)).

LLC property has decreased due to the foreclosure by Smith's creditor. Furthermore, Plaintiffs may not have invested their funds had they known of the prior lien. The issues of causation and damages will be more fully addressed in the evidentiary hearing on damages. Still, there is sufficient evidence for the Court to grant summary judgment on Plaintiffs' negligence claim because it is clear that by failing to pay his debt and allowing the property to be foreclosed, Smith caused damages to the other members of the LLC. Plaintiffs' Motion is granted regarding Plaintiffs' negligence claim.

C.      NEGLIGENT MISREPRESENTATION

Under Utah law, to prove negligent misrepresentation several elements must be shown: (1) the plaintiffs reasonably relied on the defendant's representation, (2) the representation constitutes a "careless or negligent misrepresentation of a material fact," (3) the defendant "had a pecuniary interest in the transaction," (4) the defendant "was in a superior position to know the material facts," and (5) the defendant "should have reasonably foreseen that the injured party was likely to rely upon the" misrepresentation.[45]

The evidence before the Court shows that Plaintiffs relied on the land not having liens, that the existence of a lien on a portion of the LLC property securing Smith's personal debt was a material fact and was not disclosed, that Smith had a pecuniary interest in both forming the LLC and seeing its purpose fulfilled, that Smith was in a superior position to know of the lien, and that Smith should have reasonably foreseen damages to others in that the LLC was precluded from

---

[45]*Price-Orem Inv. Co. v. Rollins, Brown and Gunnel, Inc.*, 713 P.2d 55, 59 (Utah 1986) (citations omitted).

obtaining letters of credit due to the lien and directly harmed by foreclosure on the property. The Court finds the elements of negligent misrepresentation satisfied and summary judgment is proper on this claim.

D.     BREACH OF CONTRACTS

Plaintiffs claim that Smith violated the implied covenant of good faith and fair dealing by not disclosing the former lien and by not paying his personal debt which resulted in foreclosure on the land. They also claim that Smith breached the promissory note executed in favor of Mulqueen on October 16, 2006.

*1.     Implied Covenant of Good Faith and Fair Dealing*

As stated above, the implied covenant of good faith and fair dealing is an implied promise to "not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract."[46]

The Court finds that Smith violated this covenant by failing to disclose his debt and failing to pay it off. The evidence before the Court shows that Smith knew of the debt and that his failure to make payments resulted in a portion of the LLC land being foreclosed. This has injured Plaintiffs' right to receive the fruits of the operating agreement because the fruits were to be the proceeds from the sale of the land. If there is less land to now sell, there will consequently be less income derived for the LLC.

---

[46]*St. Benedict's Dev. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991).

2. *Breach of Promissory Note*

The Promissory Note is attached to Plaintiffs' Memorandum in Support and shows that Smith agreed to pay Mulqueen $50,000.00 plus interest at the rate of 10% per annum on December 16, 2006. The Note also provides for a $500.00 late fee and attorney fees and costs of collection. Mulqueen has alleged in an affidavit that Smith paid $50,000.00 on the note approximately eleven months after the full amount was due. Smith further alleges that the remaining amount owing has not been paid.

The Court finds that Smith breached the contract created when he signed the Note by not paying on time and by not paying the full amount owed. However, Plaintiffs have failed to provide a breakdown for how they reached the amount of $16,465.75 as proper damages for the breach. Consequently, the Court will not award damages at this point. Rather, Plaintiffs shall address the calculation of damages on the Note at the damages hearing.

E.   RECISION OF THE LAND SALE BETWEEN SMITH AND MULQUEEN

Mulqueen seeks recision on the forty acres of land he purchased from Mulqueen in August 2007. However, Plaintiffs' memorandum in support does not address this issue, nor have Plaintiffs produced evidence which demonstrates wrongdoing on behalf of Smith. The Court denies the Motion insofar as it seeks judgment on this claim. However, because the matter was not briefed, the denial is without prejudice. Mulqueen may file a partial motion for summary judgment on this issue.

## V. CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Plaintiffs' Motion for Partial Summary Judgment (Docket No. 39) is GRANTED IN PART AND DENIED IN PART. Summary judgment shall be entered in favor of Plaintiffs on all of Defendant's remaining crossclaims and on Plaintiffs' Breach of Fiduciary Duty, Negligence, Negligent Misrepresentation, Breach of Contract by violating the implied covenant of good faith and fair dealing, and Breach of Contract regarding the promissory note signed by Smith and delivered to Mulqueen. The Court Denies summary judgment without prejudice on Plaintiffs' claim seeking recision of the land sale between Smith and Mulqueen. The appropriate measure of damages, including damages owed due to the breach of the promissory note, shall be determined after the Court holds an evidentiary hearing.

DATED   December 14, 2010.

BY THE COURT:

_____

TED STEWART
United States District Judge

21